**Robert MORENZ and Clara Morenz, Plaintiffs,**

**v.**

**Patricia WILSON–COKER, Commissioner Connecticut Department of Social Services, Defendant.**

**No. CIV.A. 3:04CV216SRU.**

United States District Court, D. Connecticut.

June 10, 2004.

Jane Leslie Tyree, Hersh & Fowler–Cruz, LLP, Rene H. Reixach, Jr., Woods Oviatt Gilman, LLP, Rochester, NY, for Plaintiff.

Hugh Barber, Patrick B. Kwanashie, Richard J. Lynch, Attorney General's Office, Hartford, CT, for Defendant.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

Robert and Clara Morenz (collectively "the Morenzes") brought this action seeking injunctive and declaratory relief against the Commissioner of the Connecticut Department of Social Services, Patricia Wilson–Coker ("Wilson–Coker"). The principal issue raised by this case is whether Robert Morenz's eligibility for Medicaid must be determined without regard to the financial resources of his community spouse, pursuant to 42 U.S.C.

§ 1396r–5(c)(3)(A).[1] Both sides have moved for summary judgment on a stipulated factual record. For the reasons stated below, the Morenzes' motion for summary judgment (doc. # 16) is GRANTED and Wilson–Coker's motion for summary judgment (doc. # 24) is DENIED.

## I. Facts

Robert Morenz, is 82 years old and a resident of Wilton Meadows Nursing Home in Wilton, Connecticut. For purposes of Medicaid, he is an "institutionalized spouse." His wife, Clara Morenz, is 77 years old and lives at the family home in Wilton, Connecticut. For purposes of Medicaid, she is a "community spouse." In January 2004, Mr. Morenz filed an application for Medicaid benefits with the Department of Social Services ("DSS"). Under the DSS Uniform Policy Manual ("UPM"), DSS will deem the assets of the community spouse to the institutional spouse when calculating financial eligibility under Medicaid, absent "undue hardship." UPM § 4025.67(B)(2). The Morenzes acknowledge that their circumstances do not fall within the definition of "undue hardship" as DSS defines that term, because the assets of the community spouse are not unavailable as a result of circumstances beyond the control of the institutionalized spouse. UPM § 4025.68(A)(2).

In support of Mr. Morenz's Medicaid application, however, Mrs. Morenz also filed: (1) a written assignment of Mr. Morenz's support rights to the State of Connecticut, and (2) a document entitled "Spousal Refusal Statement," in which Mrs. Morenz disclaimed any intention to provide her husband with financial assistance. In 2003, institutionalized spouses could qualify for Medicaid if their community spouse maintained assets (called a Community Spouse Resource Allocation or "CSRA") of not more than $90,660. In the 36 months prior to November 1, 2003, the first date for which Mr. Morenz sought Medicaid coverage, Mr. Morenz transferred title to $323,131.10 in assets to his wife using a durable power of attorney Mr. Morenz had executed on December 1, 2000. Mr. Morenz's care at Wilton Meadows costs $9,145 per 31–day month. After Medicare Part B deductions, Mr. Morenz currently earns $1,530/month from Social Security. Mr. Morenz's application for Medicaid was denied on March 1, 2004 on the basis of excess resources.

## II. Procedural History

On February 25, 2004, the Morenzes moved for a temporary restraining order and preliminary injunction to require Wilson–Coker and the DSS to use only Mr. Morenz's remaining assets when computing his eligibility for Medicaid. That motion was denied without prejudice in favor of proceeding to a prompt summary judgment hearing. Both the Morenzes and Wilson–Coker now move for summary judgment.

## III. Standard of Review for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted). The

---

**1.** The initial complaint also addressed Wilson–Coker's consideration of Mr. Morenz's financial transfers to Mrs. Morenz pursuant to 42 U.S.C. § 1396p(c)(2)(B)(i), but both parties agree that inquiry into that issue is not necessary to this decision.

burden is on the moving party to establish that there are no genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden on the moving party "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once this burden has been met, "the burden shifts to the non-moving party to raise triable issues of fact." *Larson v. Prudential Insurance Company of America,* 151 F.Supp.2d 167, 171 (D.Conn.2001). If the non-moving party then fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should be granted. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## IV. Discussion

Medicaid is a collaborative state and federal program designed to provide for individuals who cannot otherwise cover the costs of their medical expenses. States may choose whether or not to participate in the Medicaid program, but having agreed to participate, states "must comply with federal statutes and regulations." *Lewis v. Thompson,* 252 F.3d 567, 569 (2d Cir.2001). The State of Connecticut has opted to participate in the Medicaid program, allocating responsibility for administration of the program to DSS. Conn. Gen. Stat. § 17b–260. DSS regulations are promulgated through the UPM.

The federal "spousal impoverishment" provision governs which resources are considered when determining Medicaid eligibility for couples like the Morenzes. This provision was enacted pursuant to the Medicare Catastrophic Coverage Act of 1988 ("MCCA"), codified at 42 U.S.C.

§ 1396r–5. The MCCA attempted to redress a number of existing problems in the original Medicaid program. Among other reforms, the new legislation sought to end the "pauperization" of the community spouse "by assuring that the community spouse has a sufficient—but not excessive—amount of income and resources available to her while her spouse is in a nursing home at Medicaid expense." H.R.Rep. No. 100–105(II), at 65 (1987), *reprinted in* 1988 U.S.C.C.A.N. 857, 888.

In order to meet these goals, the MCCA established a series of steps used to determine the Medicaid eligibility of an institutionalized spouse. *See Wisconsin Department of Health v. Blumer,* 534 U.S. 473, 482, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002). First, as a rule, assets of both spouses are calculated together to determine Medicaid eligibility. 42 U.S.C. § 1396r–5(c)(1)(A)(i). If the total of the combined assets is sufficiently small, the institutionalized spouse may qualify for Medicaid benefits. Recognizing the need to preserve certain assets to the community spouse, however, the law provides for setting aside a Community Spouse Resources Allowance ("CSRA"). In order to calculate the CSRA, the couple's total resources at the time of the institutionalization of the institutionalized spouse are calculated and divided by two. Each half is a "spousal share," and the community spouse's spousal share is her CSRA. 42 U.S.C. § 1396r–5(c)(1)(A). The CSRA will then be deemed unavailable to the institutionalized spouse for purposes of the eligibility assessment. 42 U.S.C. § 1396r–5(d). Assets in excess of the CSRA limit (with the exception of a small personal allowance outlined in 20 C.F.R. § 416.1205) must generally be spent down before the institutionalized spouse can be eligible for Medicaid coverage. 42 U.S.C. § 1396r–5(c)(2); UPM 4022.05(B)(2); UPM 4025.67(D)(3).

In the Morenzes' case, the spousal share exceeded the statutory CSRA ceiling of $90,660. Neither the $90,660 limit nor the calculation of the Morenzes' assets is in dispute. Because Mrs. Morenz's available resources exceed the $90,660 cap by approximately $157,500, DSS denied Mr. Morenz's Medicaid application on the basis of excess resources. The Morenzes challenge the State of Connecticut's denial of Mr. Morenz's application for Medicaid benefits.

In light of the collaborative nature of the Medicaid program, states choosing to adopt Medicaid have "significant discretion to design [Medicaid] programs" as long as those programs are "consistent with federal law." *A.K. v. Division of Medical Assistance*, 350 N.J.Super. 175, 794 A.2d 835, 838 (2002). The Supreme Court has noted that courts have "not been reluctant to leave a range of permissible choices to the States" in interpreting provisions similar to the Medicaid statute. *Blumer*, 534 U.S. at 495, 122 S.Ct. 962. In other words, states can implement Medicaid as they see fit as long as state laws and regulations do not conflict with their federal counterparts.

The federal provision critical to the outcome of this action outlines circumstances under which institutionalized spouses "shall not be ineligible" because of excess resources. The relevant language is as follows:

Assignment of support rights. The institutionalized spouse shall not be ineligible by reason of resources determined under paragraph (2) to be available for the cost of care where—

(A) the institutionalized spouse has assigned to the State any rights to support from the community spouse;

(B) the institutionalized spouse lacks the ability to execute an assignment due to physical or mental impairment but the State has the right to bring a support proceeding against a community spouse without such assignment; or

(C) the State determines that denial of eligibility would work an undue hardship.

42 U.S.C. § 1396r–5(c)(3).

In order to assist states implementing Medicaid programs, the Department of Health and Human Services' ("DHHS") Center for Medicare and Medicaid Services issues a State Medicaid Manual. The manual "makes available to all State Medicaid agencies ... informational and procedural material needed by the States to administer the Medicaid program." CMS State Medicaid Manual, Part 1, Foreword (A). Directives in the manual are "official interpretations of the law and regulations, and, as such are binding on Medicaid State agencies." *Id.* at Part 1, Foreword (B.1). According to the CMS State Medicaid Manual:

Eligibility will not be denied institutional spouses who have resources in excess of the eligibility limits when one or more of the following circumstances exist:

● All support rights of institutionalized spouses are assigned to States;

● Support rights cannot be assigned to States because institutionalized spouses have physical or mental impairments of a degree which under State law prohibit them from legally assigning rights; and States have rights under State law to bring support proceedings against community spouses without an assignment;

● You have determined that denial of eligibility creates undue hardship ....

*Id.* at § 3262.2(D). The Supreme Court has recognized the broad discretion that the Secretary of the DHHS enjoys to establish regulatory guidelines to interpret the Medicaid statute. *Atkins v. Rivera,* 477 U.S. 154, 162, 106 S.Ct. 2456, 91

L.Ed.2d 131 (1986). The Court has gone so far as to say that, when consistent with the federal statute's plain language, the Secretary of DHHS's rulemaking authority is entitled to "legislative effect" and "is controlling unless [ ] arbitrary, capricious, or manifestly contrary to the statute." *Id.* (internal citations omitted).

Under both the federal statute and the DHHS's regulations, if Mr. Morenz assigns rights to support from Mrs. Morenz to the State of Connecticut ("any" rights under the statute; "all" rights under the regulations), he "shall not be ineligible" for Medicaid because of excess resources. Although the states are granted broad rights to interpret the federal statute, they cannot create a provision that conflicts with this language. In other words, the State of Connecticut cannot create laws or regulations under which institutionalized spouses who have assigned rights to support to the State are ineligible for Medicaid coverage because of excess resources.

Thus, in order for Wilson–Coker to avoid this federal statute and the DHHS regulations, she must show that Connecticut law places limits on the permissible assignment of rights, either broadly or with reference to the Morenzes' particular situation. In support of an argument that Connecticut law prohibits the Morenz assignment, she cites to two state law provisions:

An institutionalized person or person in need of institutional care who applies for Medicaid shall assign to the Commissioner of Social Services the right of support derived from the assets of the spouse of such person, provided the spouse of such person is unwilling or unable to provide the information necessary to determine eligibility for Medicaid. If such applicant lacks the ability to execute an assignment due to physical or mental impairment, the commissioner may bring a support proceeding against such applicant's spouse without such assignment.

Conn. Gen.Stat. § 17b–285, and:

The applicant of [sic] Medicaid benefits must assign to [DSS] rights to support available from the assets of the community spouse when the community spouse is unable to provide the information necessary to complete an assessment of spousal assets.

UPM 7520.07(A).

■ Wilson–Coker argues that these provisions deprive an institutionalized spouse of the right to assign to the State his rights against the community spouse's property when the community spouse cooperates with the State by providing information necessary to determine Medicaid eligibility. Were that the case, Mr. Morenz could not assign his spousal support rights to the State because Mrs. Morenz has supplied eligibility information to the State. Neither the statute nor the regulation, however, supports this interpretation or the asserted consequences for the Morenzes.

The Connecticut statute and the DSS regulation describe circumstances in which an institutionalized spouse "shall" assign or "must" assign rights to the DSS, but neither limits the circumstances under which an institutionalized spouse "may" assign such rights. Elsewhere in Connecticut General Statutes, Title 17b, when the Connecticut legislature has seen fit to strictly limit the application of state law to particular circumstances, it has used the phrase "only if." Conn. Gen.Stat. § 17b–271 ("An agreement with the Commissioner of Social Services under section 17b–267 may be terminated . . . (2) by the Commissioner of Social Services . . . only if he finds . . . ."). Likewise, in the UPM, when the DSS intended to impose absolute limits on the circumstances in which eligibility

could apply, it notes that X is true "only if" Y is true. UPM 4022.05(A)(7) ("In such a case, the [institutionalized spouse] may be eligible only if ....."). In this instance, neither the state legislature nor the DSS chose to use such unambiguous language. Wilson–Coker advances a number of arguments based on the proposition that Connecticut law grants acceptance of spousal support rights "only" when the community spouse cannot or will not provide eligibility information. The premise underlying those arguments is flawed; thus, all arguments made in reliance on that premise are unfounded.

Wilson–Coker attempts to reinforce her argument with reference to State legislative history. She points to testimony presented in the Human Services Joint Standing Committee Hearing of April 2, 1991 as evidence of legislative intent to limit assignments like the Morenzes have made. That testimony characterized HB7358, which passed as Public Act No. 91–396, and ultimately amended Connecticut General Statutes § 17b–285. During testimony, the Commissioner of Social Services noted:

> Our intent is to avoid penalizing Medicaid applicants when, through no fault of their own, insufficient information is available. *Since our intent is to limit assignments to those situations where the spouse is not able or is unwilling to provide the necessary information,* we request a change in Raised HB7358 as drafted.

Conn. Joint Standing Committee Hearings, Human Services, Pt. 4, 1991 Sess., p. 1348, 1349 (Apr. 2, 1991) (Testimony of Audrey Rowe, Commissioner of Social Services) (emphasis added). Unfortunately, although this may have been an accurate expression of state legislative intent, it was not reflected in the language of Connecti-

cut law. None of the language of § 17b–285 expresses such a limit on assignment.

Wilson–Coker is eager to explain that Connecticut law controls and that the federal statute is ambiguous. Even accepting those arguments, she faces the additional hurdle of demonstrating that state law prohibits this kind of assignment. Because neither state law nor state regulations prevent Mr. Morenz from assigning spousal support rights to the State, Wilson–Coker must argue that the *means* by which the Morenzes created the assignment were invalid. She argues that point in two ways: (1) by attempting to show that Mrs. Morenz's power of attorney did not authorize the assignment; and (2) by framing the assignment as a violation of the community spouse's fiduciary duties.

■ First, Wilson–Coker argues that the power of attorney did not grant Mrs. Morenz authority to assign Mr. Morenz's support rights. Wilson–Coker does not thoroughly develop her argument on this point, and the Morenzes highlight a number of provisions found in the power of attorney documents ("Morenz Power of Attorney") that support assignment. The Morenz Power of Attorney authorizes, among other powers, "qualify[ing] the principal for various government entitlement programs such as Medicaid ... including the power to divest [Mr. Morenz] of sufficient assets to so qualify." Morenz Power of Attorney at 3, ¶ Y (Stipulation of Undisputed Facts at Exhibit 1). It allows Mrs. Morenz to "hire legal counsel and otherwise act to represent and/or protect [Mr. Morenz's] interest in any legal transaction." *Id.* at 3, ¶ Z. Assignment could fall under the rubric of either, serving both as a method of achieving Medicaid eligibility and as protection of Mr. Morenz's legal interest.

State statutory law supports a broad interpretation of the power of attorney in

Connecticut.[2] The Morenz Power of Attorney permits Mrs. Morenz to serve as her husband's agent for purposes of "claims and litigation" (Morenz Power of Attorney at 1, ¶ H), "personal relationships" (*id.* at 1, ¶ I), and "all other matters" (*id.* at 2, ¶ L). Connecticut law defines authority over "claims and litigation" to include authority to "do any other act or acts, which the principal can do through an agent, in connection with any claim by or against the principal or with litigation to which the principal is or may become or be designated a party." Conn. Gen.Stat. § 1–51(10). The reference to "personal relationships" encompasses acts necessary to maintain a spouse's standard of living and acts an agent can perform to promote a spouse's welfare. Conn. Gen.Stat. § 1–52(1, 14). Authority over "all other matters" represents a catch-all to permit an agent "to act as an alter ego of the principal with respect to any matters and affairs not [otherwise] enumerated ...." Conn. Gen.Stat. § 1–55. The plain language of the Morenz Power of Attorney and relevant state law suggest a broad reading of Mrs. Morenz's authority.

■ Second, Wilson–Coker argues that Mrs. Morenz violates her fiduciary duty to her spouse by assigning support rights as she has. The Morenzes accurately point out that assignment works against *Mrs. Morenz's* own financial interest by inviting legal action from the state of Connecticut. By taking steps to ensure that Mr. Morenz secures funding for his nursing facility care, Mrs. Morenz has acted in compliance with her fiduciary duties to her husband. The New York Court of Appeals has noted that common sense dictates that institutionalized spouses would generally prefer that the state pay for care than that their families do so. *Matter of Shah,* 95 N.Y.2d 148, 160, 711 N.Y.S.2d 824, 733 N.E.2d 1093 (2000). Without any indication that Mr. Morenz's level of care would deteriorate after assignment, it is unclear how the assignment works to his detriment in any way.

■ Wilson–Coker also argues that, even assuming the validity of assignment, the state cannot enforce support rights against a community spouse. The Morenzes respond that, pursuant to Connecticut General Statutes § 46b–215, the state can collect against Mrs. Morenz. The relevant language is as follows:

> (a)(1) The Superior Court or a family support magistrate shall have authority to make and enforce orders for payment of support against any person who neglects or refuses to furnish necessary support to such person's spouse or a child under the age of eighteen, according to such person's ability to furnish such support, notwithstanding the provisions of section 46b–37.

> *   *   *   *   *   *

> (3) Proceedings to obtain orders of support under this section shall be commenced by the service on the liable person or persons of a verified petition with summons and order, in a form prescribed by the Office of the Chief Court Administrator, of the husband or wife, child or any relative or the conservator, guardian or support enforcement officer, town or state, or any selectmen or the public official charged with the administration of public assistance of the town, or in TANF support cases, as defined in subdivision (14) of subsection (b) of sec-

---

**2.** The reference incorporated into the Morenz Power of Attorney is to the Connecticut Statutory Short Form Power of Attorney Act, sections 1–42 to 1–56. That act, P.A. 573, February, 1965, is codified in the Connecticut General Statutes at § 1–42 to § 1–56 (with the exception of § 1–54a).

tion 46b–231, the Commissioner of Social Services. The verified petition, summons and order shall be filed in the judicial district in which the petitioner or respondent resides or does business, or if filed in the Family Support Magistrate Division, in the judicial district in which the petitioner or respondent resides or does business.

Conn. Gen.Stat. § 46b–215(a)(1), (3). This statute appears to authorize the State to initiate proceedings against any person or persons liable for support payments.

Wilson–Coker notes that this statute "only authorizes the Superior Court or a family support magistrate to make and enforce orders for payment of support against any person who neglects or refuses to furnish necessary support to such person's spouse or a child." Defendant's Memorandum in Support of Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment at 20. Although this proceeding arises out of the Morenzes' attempt to secure Medicaid coverage, once assignment and spousal refusal have occurred, that is exactly the purpose for which the state of Connecticut would pursue Mrs. Morenz; the State will press Mrs. Morenz to pay support, having refused (via the spousal refusal document) to provide necessary support for her spouse. The statute is not limited, as Wilson–Coker argues, to TANF cases, but makes a broader reference to judicial authority to "make and enforce" orders of financial support. There is no specific reference to Medicaid or reimbursement in this statute, but the statutory language is sufficiently broad to support such an interpretation.

## V. Statutory Purpose

■ The federal Medicaid program "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." *Atkins v. Rivera,* 477 U.S. 154, 156, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986). Wilson–Coker notes that permitting Medicaid eligibility in cases like those of the Morenzes would undermine the intent of the program. She notes that should the court find in favor of the Morenzes:

> All the community spouse [would] have to do is sign a statement refusing to support the institutionalized spouse while the institutionalized spouse signs a statement assigning support rights to the State and suddenly, the burden shifts to the State to try to get money from the community spouse, even though by then the money will most likely be gone or, at best, be very difficult to recover.

Defendant's Memorandum in Support of Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment at 26. This is true. Moreover, the MCCA rules seek to "ensure that couples pay their fair share of Medicaid costs and that each spouse support each other up to amounts over those designated as protected assets for the community spouse." *Id.* Thus, the holding in this case seemingly flies in the face of the legislative intent behind the Medicaid program. Legislative intent is entirely relevant to an assessment of a vague statutes, but of little use when a statute is clear on its face. Under the federal statute, an institutionalized spouse cannot be denied Medicaid eligibility because of excess resources when he has assigned support rights to the state. Nothing under Connecticut law prevents such assignment. When assignment is coupled with spousal refusal, existing law refuses to deny Medicaid eligibility because of excess resources even if the couple actually has resources in excess of the limits contemplated by lawmakers.

■ Wilson–Coker understandably bemoans the "pay and chase" system this situation creates, under which the State must expend scarce resources pursuing funding from community spouses whose resources exceed the Medicaid threshold. Paying and chasing wastes funds set aside for those in need, and embroils the community spouse in litigation with the State. Still, it is axiomatic that the obligation of the court is to "take statutes as we find them, guided, if ambiguity appears, by legislative history and statutory purpose." *Diamond v. Chakrabarty,* 447 U.S. 303, 315, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980); *see Mertz v. Houstoun,* 155 F.Supp.2d 415, 427 (E.D.Pa.2001) (The court, although finding for the plaintiff in a similar case, noted that allowing eligibility after a transfer of funds in excess of the CSRA was "inconsistent with an apparent purpose of the MCCA and indeed the whole thrust of the Medicaid program ...."). In the absence of ambiguity in either the federal or state statutes, I have no alternative but to grant summary judgment in favor of the Morenzes.

## VI. Eleventh Amendment

Pursuant to 42 U.S.C. § 1396a(a)(34), a person found to be eligible for Medicaid benefits will receive those benefits starting three months prior to the month of application. The statute provides:

> [I]n the case of any individual who has been determined to be eligible for medical assistance under the plan, such assistance will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application (or application was made on his behalf in the case of a deceased individual) for such assistance if such individual was (or upon application would have been) eligible for such

assistance at the time such care and services were furnished[.]

*Id.* As the District Court for the Northern District of New York noted, "[t]he statute bespeaks no conditions or exceptions." *Caldwell v. Blum,* CCH Medicare & Medicaid Guide ¶ 30,774 at 9360 (N.D.N.Y. 1980), *aff'd,* 661 F.2d 907 (2d Cir.1981).

■ The retroactivity of Medicaid benefits raises the possibility of an Eleventh Amendment bar. The *Caldwell* Court determined that the Eleventh Amendment immunity argument must fail for three reasons, the first of which being that "this [portion of the] statute, by its terms, comprises part of the current standards governing eligibility for ... medical assistance." *Id.* at 9361. In other words, the three-month retroactivity is part of the current eligibility determination, and thus is not an infringement on Eleventh Amendment immunity. The *Caldwell* Court relied on a prior Second Circuit decision that affirmed that the three-month period did not constitute unconstitutional retroactive relief. *Greklek v. Toia,* 565 F.2d 1259 (2d Cir.1977). Under this precedent, Eleventh Amendment immunity does not bar an order that Mr. Morenz is eligible for Medicaid benefits starting three months before today. Thus, this decision being filed on June 10, 2004, Mr. Morenz's Medicaid eligibility will be effective beginning March 10, 2004.

## VII. Attorneys' Fees

Because this claim for violation of the Medicaid statute is enforceable under 42 U.S.C. § 1983, the Morenzes, as a prevailing party, are entitled to attorneys' fees pursuant to 42 U.S.C. § 1988. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The amount shall be determined following subsequent proceedings.

## VIII. Conclusion

For all the reasons stated above, the Morenzes' motion for summary judgment (doc. # 16) is GRANTED and Wilson–Coker's motion for summary (doc. # 24) judgment is DENIED. An injunction prohibiting Wilson–Coker from denying Medicaid eligibility to Mr. Morenz shall enter.

It is so ordered.